# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER GRAHAM | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 2:17-CV-01130-KOB |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On October 29, 2012, the claimant protectively applied for disability insurance benefits and a period of disability under Title II of the Social Security Act. The claimant alleged disability beginning April 26, 2011, because of lumbar disc disease, cervical disc disease, right shoulder impingement, obesity, and depression. The Commissioner denied the claims on January 30, 2013. On

February 8, 2013, the claimant filed a written request for a hearing before an administrative law judge (ALJ), and she held a video hearing on February 26, 2014. (R. 13, 91–92, 109, 133, 244).

In a decision dated April 4, 2014, the ALJ found that the claimant was not disabled as defined by the Social Security Act and was, therefore, ineligible for disability benefits. On November 17, 2015, the Appeals Council granted the claimant's request for review. The Appeals Council vacated the hearing decision and remanded the case to an ALJ to obtain supplemental evidence from a vocational expert to clarify the assessed limitations' effect on the claimant's occupational base. The ALJ held a second hearing on April 25, 2016, and again found that the claimant was not disabled under the Social Security Act in a decision dated August 25, 2016. (R. 7, 10–11, 106, 109, 127–28).

On May 17, 2017, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, the court REVERSES and REMANDS the decision of the ALJ.

## II. ISSUE PRESENTED

The issue before the court is whether the ALJ accorded proper weight to the opinions of the claimant's treating physician. The claimant raised three other issues involving the ALJ's findings regarding the claimant's residual functional capacity, the ALJ's assessment of the claimant's subjective testimony, and the ALJ's consideration of the claimant's disability pension. Because the court finds that substantial evidence does not support the ALJ's decision regarding the weight she gave Dr. Savage's opinions, the court will not address these other issues.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if she applied the correct legal standards and if her factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity (RFC), and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.*, that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take

account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Absent a good showing of cause to the contrary, the ALJ must accord substantial or considerable weight to the opinions of treating physicians. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). The ALJ must credit the opinions of treating physicians over those of consulting physicians unless good cause exists for treating the opinions differently. *Lewis v. Callahan*, 125 F.3d 1436, 1440–41 (11th Cir. 1997). The ALJ may discount a treating physician's report when it is not accompanied by objective medical evidence or is wholly conclusory. *Crawford v. Commissioner*, 363 F.3d at 1159. Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight but substantial evidence does not support those reasons, the ALJ commits reversible error. *See Moore v. Barnhart,* 405 F.3d 1208, 1212 (11th Cir. 2005).

## V. FACTS

The claimant was forty-five years old at the time of the ALJ's final decision. The claimant has a college education[1] and past relevant work for the State of Alabama as a youth service counselor. The claimant alleged disability beginning

---

[1] In her opinion, the ALJ found that the claimant had "at least a high school education"; however at numerous points in the record the claimant stated that he has a Bachelor of Science degree in Criminal Justice from Alabama State University. He graduated in 1995 with a GPA of "2.8 or 2.9." (R. 25, 37, 456).

on April 26, 2011 because of lumbar disc disease, cervical disc disease, right shoulder impingement, obesity, and depression.  (R. 13, 25, 38).

*Physical and Mental Impairments*

On April 26, 2011, the claimant sought treatment with Dr. P. Lauren Savage, Jr., an orthopedic surgeon at Alabama Orthopedic, Spine and Sports Medicine Associates, for pain in his right shoulder and neck, with his neck pain radiating down to the right arm.  The claimant's pain resulted from a car accident on September 7, 2010.  He assessed his right side pain as severe with a ranking of eight out of ten on the pain scale, and his neck pain as moderate with a rating of four.  The claimant denied feeling depressed or anxious, and reported that his pain increased with lifting, twisting, driving, lying on his back, and rising from sitting. Activities and sleeping made his symptoms worse.  On examination, the claimant's neck and shoulder showed no instability.  Dr. Savage prescribed the claimant Mobic and ordered MRIs of the claimant's right shoulder and cervical spine.  (R. 433–35).

The MRI of the claimant's cervical spine showed posterior broad-based disc bulging; bilateral severe neural foraminal stenosis at C3-4; mild central canal stenosis at C3-4; mild concentric disc bulging and mild central canal and left neural foraminal stenosis at C4-5; concentric disc bulging and a right posterior protrusion at C5-6; bilateral moderate neural foraminal stenosis; mild right central

canal stenosis; and a small broad-based central protrusion at C6-7, with mild impression on the thecal sac. The impression was degenerative changes and disc disease and stenosis. At a follow-up appointment on May 3, 2011, Dr. Savage gave the claimant injections of numbing and steroid medications and recommended a course of physical therapy. (R. 429, 440).

On July 1, 2011, the claimant returned to Dr. Savage with continuing pain and numbness in his right shoulder and pain in his mid and lower back. The claimant complained that he woke at night with pain three nights during the week. X-ray imaging of the claimant's lumbosacral spine and thoracic spine showed no disc space narrowing, acute osseous lesions, or any significant degenerative arthritis. Dr. Savage discussed treatment options with the claimant, and recommended an arthroscopy of his right shoulder. Dr. Savage performed an acromioplasty, an arthroscopic surgery to remove a small piece of the acromion that is causing friction between the bone and the tendon, and a Mumford procedure, an operation to remove the end of the clavicle to ameliorate shoulder pain, on the claimant's right shoulder on July 8, 2011. (R. 420, 422, 441).

Between July 15 and September 2, 2011, the claimant saw Dr. Savage four times for follow-up appointments. Following his surgery, the claimant had superficial abscesses in axilla, which cleared, and he reported an improved range

of motion in his shoulder but with mild tenderness.  Dr. Savage prescribed

Percocet and further physical therapy.  (R. 415–419).

On October 14, 2011, the claimant saw Dr. Savage for persistent back, leg,

neck, arm, and upper back pain.  The claimant's leg pain and tingling and

numbness were "worse [] than right after [the] wreck."  The claimant denied a

history of depression, anxiety, bipolar or schizophrenia.  Dr. Savage's bilateral

lumbar examination revealed that the claimant had limited lumbar flexion,

extension, and rotation, and his muscle strength was "grossly normal" and equal

bilaterally.  He had moderate subacromial tenderness and good range of motion in

his right shoulder, although he had pain with flexion over the head, horizontal

adduction, and internal rotation.  A new MRI of the claimant's cervical spine

showed formal protrusion on the right and moderate to severe right and mild left

neural foraminal stenosis at C5-6, as well as mild central canal stenosis.  A new

MRI of his lumbar spine showed central protrusion and moderate right neural

foraminal stenosis at L5-S1 and herniation with annular tear.  The impression was

nerve root impingement syndrome and herniated nucleus pulp/lumbar.  Dr. Savage

ordered a lumbar epidural injection and recommended further physical therapy.

(R. 409–11, 442–43).

On December 27, 2011, the claimant saw Dr. Savage for pain in his shoulder

and back.  The claimant noted that when he was able to rest and not do too much

his pain was a four or a five on a ten-point pain scale. But, when he had a "pain-out" his pain was a ten and "stop[ped] him in his tracks." Additional symptoms included radiation of pain on his right side, sleep disturbances, stiffness, range of motion limitation, and weakness. The claimant denied a history of depression, anxiety, bipolar, or schizophrenia. In his bilateral lumbar spine, he had good alignment but generalized tenderness. X-ray imaging showed no acute changes, and Dr. Savage gave the claimant injections of numbing and steroid medications. (R. 405–06).

The claimant saw Dr. Savage on February 21, 2012 for severe lower back pain, which the claimant rated as an eight on a ten-point scale. Dr. Savage noted that the claimant's current condition prohibited him from working in his previous profession. (R. 399, 401).

On July 17, 2012, Dr. Savage completed a Report of Disability on behalf of the claimant for the Retirement Systems of Alabama (RSA). Dr. Savage stated that the claimant's job required "a lot of monitoring" and "excessive walking," as well as daily physical confrontations with students. He stated that the claimant would not be able to participate in control force tactics training because of his conditions, and maintaining a safe physical environment would require too much demanding physical work for the claimant. Dr. Savage further noted that, in his professional

opinion, the claimant was totally incapacitated from further performance of his duties and his disability was permanent. (R. 463–64).

In his report, Dr. Savage described the claimant's pathophysiologic diagnoses as having a lumbar disc herniation that may need surgery and impingement and rotator cuff tendonitis that the claimant had surgery on in 2011 and still had symptoms and decreased range of motion in his right shoulder. Dr. Savage noted that the claimant would have activity restrictions even if he had back surgery. Reasonable accommodations that the claimant's employer could make to allow the claimant to continue his employment would require light duty, including no lifting over ten pounds; no overhead lifting; no physical confrontations with students; and no prolonged standing, walking, or sitting. Dr. Savage supported his diagnoses and findings with multiple MRI reports, operative reports, and physical therapy reports. (R. 463–64).

On September 27, 2012, the RSA notified the claimant that his application for retirement benefits had been approved. On October 29, 2012, the claimant filed for disability insurance benefits and a period of disability under the Social Security Act. The claimant completed a Function Report-Adult on December 26, 2012. In his report, the claimant stated that he had difficulty falling and staying asleep due to his pain. He did not feel rested when he woke up in the morning, and he was hard to wake up and groggy throughout the day when he was on his pain

medication.  He lacked motivation to change his clothing because of his pain and depressed feelings.  He sat down to get dressed because he had difficulty standing, and he wore comfortable clothing that was easy to slip on and off because of his difficulty manipulating snaps, buttons, and zippers.  He wore slip-on shoes to avoid bending, and needed to take a rest break after dressing because of his fatigue and pain.  (R. 91, 244–46, 304–05, 313).

The claimant lacked motivation to shower because of his pain and depressed feelings, and while showering he needed to lean up against the shower wall for support because it was difficult for him to stand.  His wife washed his hair and he went to a barber to shave his face because of his difficulty using his right arm, shoulder, and hand.  He had difficulty cutting food, and his appetite fluctuated depending on his mood and pain level.  At times, the claimant needed to use the sink, wall, or counter for support while getting on and off of the toilet because he had difficulty getting up and down from a seated position, and he leaned against the sink for support when brushing his teeth.  He was able to prepare simple things to eat for himself, such as sandwiches, cereal, microwave meals, and soups.  He used to enjoy cooking complex meals on a regular basis, but was limited in his ability to stand and prepare lengthy meals because of his pain.  He had difficulty bending and reaching for items in the cabinet, chopping up ingredients, and using his hands to lift pots and pans of food and twist lids off of jars.  (R. 305–06).

The claimant limited his driving to short distances because he was unable to sit for long periods of time. He also had difficulty operating the pedals while driving for long periods of time; holding onto the steering wheel with his right hand; getting in and out of the vehicle; and turning his head to check for traffic, requiring him to rely more on the mirrors. The claimant went shopping in stores about once a week for fifteen minutes, and leaned up against the cart for support and took rest breaks. He needed to shop at off peak times when the stores are less crowded so he could avoid standing. The claimant was able to pay bills, count change, handle a savings account, and use a checkbook; however he used his debit card more than before his injury to avoid writing. While watching television, using the computer, or reading, the claimant shifted positions frequently while sitting, and had difficulty typing or using the computer mouse. (R. 307–09).

The claimant saw consultative examiner Cynthia Neville, Ph.D., for a psychological evaluation on January 14, 2013. The claimant told Dr. Neville that he had felt more irritable since his neck, back, and shoulder problems began, and that he had "isolated [himself] from others due to the depression." Further the claimant noted that he went on medical leave from his prior job when his issues began, and when he sent the youth center an update on his status in 2012 they "suspended [his] service because [he] couldn't come back in the capacity that [he] did before." (R. 455, 505).

When asked about his medications, the claimant told Dr. Neville that he did not see any benefits from his prescribed medications and that they caused him to fall asleep. The claimant commented that "[i]t's hard to wake up on that medication. I'm out." Dr. Neville reported that the claimant's gait was somewhat slow, but he walked without an assistive device. He frequently shifted around in his chair and appeared to be in physical discomfort. The claimant could calculate simple addition, subtraction, multiplication, and division problems. He performed two calculations of serial seven correctly, and then made an error on his third attempt. On his memory test, the claimant remembered three out of three items immediately, but only two following a five-minute delay. (R. 455–56).

The claimant reported to Dr. Neville that he lives in a house with his wife and their three daughters. He noted that his sleeping is "sporadic" and said "I spend most of the time sleeping in a chair for about a year now. I can't get comfortable. If it's not my shoulder, it's my back." The claimant was able to bathe, dress, and groom himself, and he watched his children during the day while his wife worked full-time. He could load the dishwasher, but relied on his wife to clean, prepare most of the meals, and do the laundry. His wife handled the finances and they split the grocery shopping. The claimant visited his grandmother on a weekly basis, and attended church "from time to time." He continued to drive, but was unable to take care of his yard. (R. 457).

Dr. Neville concluded that the claimant's mild symptoms of depression and anxiety were unlikely to improve significantly over the next twelve months; that the claimant possessed the cognitive abilities to understand work instructions, but his ability to remember and follow through might be limited by his symptoms of depression and anxiety "to a mild degree sometimes"; and that his ability to interact appropriately with coworkers and supervisors or to handle typical work pressures would likely be negatively impacted by his symptoms of depression and anxiety "to a mild degree occasionally." (R. 458).

On January 19, 2013, the claimant saw Antonio Rozier, M.D., for a consultative examination with complaints about shoulder and spine pain. Dr. Rozier found that the claimant was independent in his daily living activities, but he did not do any cleaning aside from putting dishes in the dishwasher. Dr. Rozier observed that the claimant had tenderness to palpation about the right lateral and superior shoulder, and pain in almost every range of motion. The claimant was able to grip and hold objects securely to the palm by his last three digits, and manipulate large and small objects with the first three digits. The diagnoses were right rotator cuff tendinitis vs. tear, lumbar degenerative disc disease spondylosis, and cervical degenerative disc disease spondylosis. (R. 459, 461–62).

On January 30, 2013, non-examining state agency physician Robert Estock, M.D., completed a Disability Determination Explanation Claimant Information

form.  Because Dr. Estock did not have an opportunity to examine the claimant, he appears to have based his findings on reports from Dr. Savage and Dr. Neville.  Dr. Estock opined that the claimant would have mild limitations in activities of daily living, moderate limitations in social functioning and concentration, persistence, or pace, and no episodes of decompression resulting in an ability to understand, remember, and carry out short, simple instructions and tasks but not detailed tasks and instructions; an ability to maintain attention and concentration for two hours with all customary rest breaks; a well-spaced work environment would be best for maximum concentration; contact with the public should be infrequent and non-intensive; supervision should be tactful, constructive, and non-threatening; and changes in the workplace should be infrequent and gradually introduced.  (R. 92–97, 102–03, 105).

Dr. Estock concluded that the claimant was able to occasionally lift twenty pounds and frequently lift ten pounds; stand and/or walk for about six hours in an eight-hour workday; and sit for about six hours in an eight-hour workday. Dr. Estock did note, however, that Dr. Savage said that the claimant should not lift over ten pounds.  Based on his findings, Dr. Estock determined that the claimant was not disabled.  (R. 94–95, 99, 105).

On January 30, 2013, the Social Security Administration denied the claimant's application for Social Security disability benefits.  The claimant saw Dr.

Savage four times between January and March 2013, complaining of lower back, right shoulder, and neck pain. At his January 9 and January 22, 2013 visits, the claimant rated his lower back pain as severe with a rating of eight out of ten, and his severe neck pain as nine out of ten on January 22. At his January 22, 2013 appointment, the claimant noted that he woke at night with pain seven nights during the week. At his April 2, 2013 appointment with Dr. Savage, the claimant's right side pain was moderate with a rating of five out of ten, and his lower back pain was a two. His neck pain was mild to moderate with a rating of three out of ten. His symptoms were made worse with activity, with twisting and turning, when sitting, and while walking. He woke with pain three nights a week. (R. 133, 468–475).

The claimant saw Dr. Savage on June 27, 2013 with moderate to severe pain in his right side, lower back, and neck, each with a pain rating of seven out of ten. The claimant reported that he woke with pain seven nights a week. X-ray imaging showed thoracolumbar degenerative changes, mild cervical degenerative changes, and no acute changes to the shoulder. Dr. Savage gave the claimant injections of Betamethasone and Marcaine. (R. 478–80).

The claimant returned to Dr. Savage for treatment on October 25, October 29, October 31, and December 17, 2013 with complaints of moderate to severe lower back and neck pain, each time rating them both seven out of a ten-point pain

scale.  Dr. Savage recommended further physical therapy and fitted the claimant with a back brace.  (R. 481, 484, 490–91, 526).

On October 29, 2013, Dr. Savage completed a Statement by Examining Physician Report of Disability on behalf of the claimant for the RSA.  In that report Dr. Savage reaffirmed his earlier statement that the claimant was totally incapacitated for further performance of his prior duty and that the claimant's disability was permanent.  Dr. Savage commented that no reasonable accommodations would allow the claimant to continue his employment.  (R. 466).

*First Hearing and First ALJ Decision*

After the Commissioner denied the claimant's request for disability benefits, the claimant requested and received the first hearing before an ALJ, L. Raquel BaileySmith, on February 26, 2014.  On March 21, 2014, following the claimant's hearing but before the ALJ's decision, the claimant saw Dr. Savage for neck pain that radiated down his left arm, lower back pain that radiated into his right buttocks, and complaints of neck and left shoulder pain.  His lower back and neck pains were severe with a rating of eight out of ten. The claimant was having problems walking and Dr. Savage prescribed Lumbar Epidural Injection Norco tablets every six to eight hours for pain, along with Flexeril and Mobic.  (R. 63, 87, 529–530).

In a decision dated April 4, 2014, the ALJ denied the claimant's application for benefits again, finding that the claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act. Specifically, the ALJ found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526). (R. 106, 109, 113).

The ALJ further determined that the claimant had the RFC to perform light work except the claimant could lift ten pounds occasionally and less than ten pounds frequently with the right dominant upper extremity. She found that the claimant could maintain attention and concentration for tasks for two hours at a time with normal breaks and must work in an environment that does not have stringent production or speed requirements. She further determined that the claimant must be allowed to alternate between standing and sitting every thirty minutes to one hour, as needed, while remaining on task, and that he would be off task up to ten percent of the day. Marcy Shulman, a vocational expert, testified that the claimant would be able to perform the requirements of representative occupations at a sedentary exertion level such as family counselor, eligibility worker, and "program aide, group work." (R. 91, 109, 113–14, 121).

Following the ALJ's denial, the Appeals Council vacated the hearing decision on November 17, 2015, and remanded the case back to an ALJ to obtain supplemental evidence from a vocational expert to clarify the effect of the claimant's assessed limitations on his occupational base. Specifically, the Appeals Council noted that the vocational expert did not indicate whether the claimant had acquired skills from his past work that would transfer to the proposed skilled jobs. Further, the claimant's RFC assessment showed that the claimant could not perform jobs with speed requirements and would be off task up to ten percent of the day. The Appeals Council instructed the ALJ to further consider whether a significant number of jobs exist the claimant could perform in the national economy given his age, education, work experience, and RFC. (R. 127–28).

Prior to the claimant's second ALJ hearing, he sought treatment from Dr. Savage on six occasions between October 15, 2014 and December 22, 2015. At his October 15, 2014, August 8, August 27, and September 10, 2015 appointments, the claimant complained of bilateral shoulder, left side, lower back, and neck pain, rating these pains as moderate to severe and as a seven on a ten-point scale. At his December 15 and December 22, 2015 appointments, the claimant's neck and lower back pains were severe, with a rating of nine out of ten. (R. 531, 534, 537, 539, 541, 543).

*Second ALJ Hearing*

On remand from the Appeals Council, the claimant had his second hearing before an ALJ, Renee Blackmon-Hagler, on April 25, 2016. The claimant testified that he lived with his wife and three children, ages four, six, and fourteen, in a two-story house. He last worked in 2011 as a youth services counselor in a juvenile correctional facility where he monitored students. He testified that he had a herniated disc in his neck and back, and a shoulder impingement that, with inflammation, rendered him immobile, unable to walk, sit up, turn his neck, or reach out without sharp, severe pain. The claimant stated that his treating physician, Dr. Savage, had not recommended surgery for his neck or back, but that the claimant had had epidurals. The claimant took medications that helped his with his pain, but that they made him "groggy, woozy," unable to concentrate, and that he "[couldn't] really function." (R. 32, 36, 38–40, 45–46, 53).

Regarding his shoulder, the claimant testified that he could not reach out or overhead, and that if he slept on his shoulder or did any lifting his pain was exaggerated and he was unable to use his arm. He had had shoulder surgery that helped for a while, but he needed steroid injections to help with the swelling and soreness in his shoulder. The claimant stated that he had been depressed but had not received any treatment; can walk for about fifteen or twenty minutes; and stand for about twenty or thirty minutes. The claimant testified that a doctor told him not

to lift over ten pounds and that he grocery shops for fifteen or twenty minutes at a time. When he shops, he can lift groceries such as bread and some meat, but not milk. He can drive, but he has had an incident because of muscle spasms; so he only drives three or four times a week, sometimes to take his children to school. (R. 41–43, 46).

The claimant stated he cannot climb a set of stairs without pain and assistance, and cannot bend over to pick things up. He referenced a time when he dropped his keys and after bending over to pick them up needed to see his doctor for two to three weeks afterwards. He stated that he can grip with his left hand, but sometimes had trouble with his right hand because of numbness in his fingers; can use a microwave; bathe himself; wash dishes; fold clothes; sweep sometimes; and pull the sheets up on his bed, but cannot actually make it. The claimant testified that he cannot do chores for longer than ten or fifteen minutes or do more than one chore on the same day. The claimant stated that he only left the house to take his children to school or to go to the grocery store, and otherwise he stays at home off of his feet. Some days he gets up and fixes his children cereal, but other days he does not get up at all. He used to fish and play basketball, but cannot do so anymore. (R. 43–44, 47).

A vocational expert, Dr. Jewel E.B. Euto, testified concerning the type and availability of jobs that the claimant was able to perform. Dr. Euto stated that the

claimant's past relevant work was as a group leader/program aide, classified as skilled work with light exertion, and a group worker, which has a light exertion level. (R. 49).

The ALJ asked Dr. Euto to assume a hypothetical individual the same age, education, and experience as the claimant who could lift ten pounds on an occasional basis; could sit at least six hours during an eight-hour workday; could stand and walk in combination no more than two hours during an eight-hour workday; could reach overhead and reach out forward on no more than an occasional basis on the right-hand side; could handle, finger and feel at the frequent level on the right-hand side; could use the left-hand side unlimited; should never climb ladders, ropes, or scaffolding; should never work at unprotected heights; and would have residual psychiatric symptoms resulting in a need for only simple and routine tasks involving no more than occasional contact with the general public. Dr. Euto responded that hypothetical person could not perform the claimant's past work. (R. 49–50).

The ALJ asked Dr. Euto if other jobs existed that would be available the hypothetical individual could perform. Dr. Euto replied that the hypothetical individual could perform work as a call-out operator, classified as sedentary exertion, unskilled work, with 100 jobs in Alabama and 50,200 in the national economy; a charge-account clerk, classified as sedentary exertion, unskilled work,

with 25 jobs in Alabama and 192,000 in the nation; and an order clerk, classified as sedentary exertion, unskilled work, with 1,600 jobs in Alabama and 200,000 in the nation. (R. 49–50).

In a second hypothetical, the ALJ asked Dr. Euto to assume all of the prior limitations in addition to the individual being off task at least twenty percent of the workday with side effects from medication and/or pain. Dr. Euto testified that individual could not perform the claimant's past work because of excessively being off task. Dr. Euto further clarified that the issue of off-task behavior was not addressed in the *Dictionary of Occupational Titles*, so her testimony was based on United States Department of Labor data and statistics, observation of job performance, and vocational rehabilitation expertise. However, upon examination by the claimant's attorney Dr. Euto clarified that the reaching requirements for the three jobs were occasional for a call-out operator and frequent for a charge-account clerk and an order clerk. Because of the reaching requirement, the number of jobs available as a charge-account clerk and an order clerk were reduced by twenty-five percent. Dr. Euto further stated that a limitation on bending would not impact the jobs identified. Finally, Dr. Euto testified that an individual who missed an average of three days of work on a sustained basis could not maintain employment in the identified jobs because of excessive absenteeism. (R. 50–52).

# VI. SECOND ALJ OPINION

On August 25, 2016, the ALJ determined that the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2016 and had not engaged in substantial gainful activity since April 26, 2011, the alleged onset date of disability. (R. 13, 27).

Next, the ALJ determined that the claimant suffered from the severe impairments of lumbar disc disease, cervical disc disease, right shoulder impingement, obesity, and depression. The ALJ found those impairments severe because they significantly limited the claimant's ability to perform basic work activity, or could be expected to do so for a period in excess of twelve months. (R. 13).

The ALJ next found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ first considered whether the claimant met the criteria for Listing 1.02 concerning major dysfunction of a joint from any cause. The ALJ determined that the claimant's impairments did not meet this listing because the claimant was able to ambulate effectively and perform fine gross movements with each upper extremity. The ALJ also found that the claimant did not meet the requirements for Listing 1.04

concerning disorders of the spine because the record contained no evidence of compression of a nerve root, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. (R. 19).

Next, the ALJ considered whether the claimant's mental impairments met or medically equaled the criteria of Listing 12.04. The ALJ found that the claimant did not meet the criteria of "paragraph B" or "paragraph C." In considering the "paragraph B" criteria, the ALJ found that the claimant only had mild restrictions in his activities of daily living, and moderate difficulties in his social functioning and concentration, persistence, or pace. She noted that the claimant took care of his two-year-old daughter[2] at home during the day and was independent with his activities of daily living; took care of his own personal needs; loaded the dishwasher; spent time with others; got along with authority figures; had never been fired or laid off from a job because of problems getting along with others; went to church and visited his grandmother; could pay bills; could count change; and could handle a savings account and maintain a checkbook. The claimant alleged that he had problems getting along with family, friends, and neighbors as well as with concentrating, completing tasks, and following instructions. However, based on the reports of Dr. Estock and Dr. Neville that the claimant's

[2] The ALJ appears to be referencing the claimant's testimony from the first ALJ hearing on February 26, 2014. At the time of the first hearing, the claimant's daughters were twelve, four, and two-years-old. At the second ALJ hearing on April 25, 2016 the claimant testified that his daughters were fourteen, six, and four-years-old. (R. 36, 63, 67–69).

symptoms might limit his ability to handle typical work pressures or follow through with instructions to a mild degree and that the claimant has moderate difficulties in social functioning, the ALJ concluded that the "paragraph B" criteria were not satisfied.  Additionally, the ALJ resolved that the claimant did not have a medically documented history of a chronic affective disorder sufficient to meet the "paragraph C" criteria. (R. 19–21).

Next, the ALJ determined that the claimant had the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a), except that he could occasionally lift or carry ten pounds and frequently lift less than ten pounds; could push and pull as much as he could carry; could sit for six hours, stand for two hours, and walk for two hours in an eight-hour workday; could occasionally reach overhead on the right; could handle, finger, and feel frequently on the right; could never climb ladders, ropes, or scaffolds; could never work around unprotected heights; and was limited to performing simple, routine tasks with only occasional contact with the general public.  In making this RFC determination, the ALJ considered the extent to which all of the claimant's symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, as well as opinion evidence.  (R. 21).

In considering the claimant's subjective allegations of pain, the ALJ applied the controlling pain standard of the Eleventh Circuit and found that the claimant's

allegations of pain were not fully credible when considered in light of the entire record. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, the claimant's allegations regarding intensity, persistence, and limiting effects of these symptoms were "not entirely consistent" with the medical evidence. The ALJ found that the claimant's reported activities of daily living were not consistent with his alleged level of pain and limitation and did not support a finding that his lumbar disc disease, cervical disc disease, or right shoulder impingement produced symptoms so severe as to be disabling. Specifically, the ALJ recounted Dr. Rozier's description of the claimant as being independent with his activities of daily living, particularly the claimant's reports that he cooked, loaded the dishwasher, and cared for his two-year-old daughter and his personal needs. (R. 22–23).

Regarding the claimant's pain in his lumbar, cervical spine, and shoulder, the ALJ noted that x-ray imaging showed only "mild cervical degenerative changes" in the claimant's cervical spine and MRI results showed only "mild degenerative disc disease" in his lumbar spine. She highlighted that the claimant was noted consistently to have normal alignment of the lumbar spine with normal and equal bilaterally muscle strength and tone. The claimant was diagnosed with a right shoulder impingement; however he had a good range of motion in his right

shoulder with intact sensation and reflexes bilaterally. The ALJ noted that, despite the claimant's reported limitations, he had good coordination with no weakness or sensory deficit. (R. 23).

The ALJ further discussed the claimant's alleged problems standing and walking that he discussed at the hearing and in his Function Report. The claimant consistently denied problems with balance, standing, or walking when seen for treatment, and his gait and station were consistently reported to be normal. The ALJ determined that the claimant was limited to sedentary work with standing for no more than two hours and walking for no more than two hours in an eight-hour workday. The ALJ noted that while the claimant alleged that he had problems reaching and using his hands, he testified that he could pick up a pen from the table. And while Dr. Rozier found the claimant to have 4/5 grip strength in his right hand, he had 5/5 grip strength in the left. He was able to grasp objects securely to the palm by the last three digits and was able to grasp and manipulate both small and large objects with the first three digits. The ALJ indicated that the claimant had a normal range of motion in his right shoulder and intact sensation and reflexes. The ALJ determined that the claimant was limited to no more than occasional overhead reaching on the right, and no more than frequent handling, fingering, and feeling with the right hand. (R. 23).

The ALJ additionally addressed the claimant's alleged obesity, determining that his obesity was not so severe as to prevent all ambulation, reaching, orthopedic and postural maneuvers. However, in combination with his lumbar disc disease, cervical disc disease, and right shoulder impingement, the claimant's obesity significantly reduced his ability to stand and walk, to stoop or bend, to perform find manipulation with his upper extremities, and to maintain postures without the need for alternation. The ALJ concluded that sedentary work with appropriate work restrictions was warranted, and that this RFC accounted for these limitations. (R. 24).

The ALJ afforded partial weight to Dr. Savage's opinions, and "good weight" to his opinion that the claimant could not lift over ten pounds because that opinion was quantifiable and consistent with the treatment for cervical disc disease and lumbar disc disease. While the ALJ acknowledged that the claimant was limited to sedentary work, she afforded little weight to the rest of Dr. Savage's opinions, including the opinions that the claimant could not lift overhead or engage in prolonged sitting. She found that those opinions were not consistent with the MRI results and the objective findings that the claimant had a good range of motion in his right shoulder with normal sensation and reflexes. Additionally, the ALJ afforded little weight to Dr. Savage's opinion that the claimant was disabled.

She noted that 20 C.F.R. 404.1527(e) reserved this determination for the Commissioner of Social Security.  (R. 24).

The ALJ further noted that the objective medical evidence did not support a finding that the claimant's depression produces disabling limitations.  She found no evidence that the claimant sought treatment regarding his psychological symptoms and noted that the claimant consistently denied a history of depression or anxiety.  While Dr. Neville diagnosed the claimant with adjusted disorder with mixed anxiety and depressed mood, she described the claimant's symptoms as only being mild in severity.  After assessing Dr. Neville's findings about the claimant's daily living activities, the ALJ concluded that the objective medical evidence did not support a finding that the claimant's depression produced disabling limitations. Even though Dr. Neville noted that the claimant's ability to follow through with instructions or handle normal work pressures might be limited to a mild degree, the ALJ accounted for these factors by limiting the claimant to simple, routine tasks, with no more than occasional contact with the general public. (R. 24–25).

The ALJ afforded "good weight" to Dr. Estock's opinions that the claimant had mild restrictions in activities of daily living, moderate limitations in social functioning, and moderate limitations in concentration, persistence, and pace.  She afforded such weight because Dr. Estock's opinions were consistent with the record as a whole, including the claimant's reports of daily living activities and the

objective medical findings.  The ALJ also afforded "good weight" to Dr. Neville's

opinions because her opinions were consistent with her own objective medical

findings, the treatment notes concerning the claimant's psychological symptoms,

and the claimant's reported activities of daily living.  (R. 25).

Finally, the ALJ concluded that, based on the vocational expert's testimony,

the claimant was unable to perform any past relevant work.  The ALJ found a

significant number of jobs in the national economy that the claimant could perform

based on his age, education, work experience, and RFC, such as call-out operator,

charge-account clerk, and order clerk.  The ALJ concluded that the claimant was

not disabled because he was capable of making a successful adjustment to other

work that existed in significant numbers in the national economy.  (R. 25–26).

## VII. DISCUSSION

The claimant argues that the ALJ did not give appropriate weight to the

opinions of the claimant's treating physician Dr. Savage.  This court agrees.

The ALJ must give the testimony of a *treating physician* substantial or

considerable weight unless "good cause" is shown to the contrary.  *Crawford*, 363

at 1159.  The Commissioner may reject any medical opinion if the evidence

supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

Even if the ALJ articulates specific reasons for failing to give the opinion of a

treating physician controlling weight, but substantial evidence does not support

those reasons, the ALJ commits reversible error.  *Moore*, 405 F.3d at 1212.  Such is the case here.

The record does not support the ALJ's determination that Dr. Savage's opinions were inconsistent with the record.  First, the ALJ stated that Dr. Savage's opinions concerning the claimant's inability to engage in prolonged sitting were not consistent with the claimant's MRI results.  However, the ALJ failed to accurately describe the objective medical evidence from those MRIs.  According to the claimant's MRIs, in addition to lumbar degenerative disc disease, the claimant also suffered from a herniated lumbar disc that contacts the nerve root at L5-S1, and caused moderate neural foraminal narrowing at L5-S1.  On several occasions Dr. Savage noted that based on his treatment of the claimant and these MRI results that the claimant could not engage in prolonged sitting.  (R. 24, 442, 453–54, 466, 499).

Furthermore, even if the ALJ had properly described the MRI findings, she improperly substituted her own opinion for that of the treating physician.  An ALJ may not act as both judge and physician, and the ALJ improperly read the MRI results as showing that the claimant could sit for extended periods of time contrary to Dr. Savage's opinions.  *See Marbury v. Sullivan*, 957 F.2d 837, 841 (11th Cir. 1991) (Johnson, J., concurring).  Because the medical evidence does not support the ALJ's claim that Dr. Savage's opinions were inconsistent with the record, the

court agrees with the claimant that the ALJ improperly rejected the claimant's treating physician's opinion.

Second, the ALJ stated that the record showed that the claimant had a good range of motion in his right shoulder with normal sensation and reflexes. Based on of this finding, the ALJ rendered Dr. Savage's opinions that the claimant could not lift overhead as inconsistent with the record. In finding so, the ALJ referenced records from the claimant's appointments with Dr. Savage that stated that the claimant had a good range of motion in his right shoulder with normal sensation and reflexes. In the referenced records, Dr. Savage tested the claimant's range of motion in his shoulder on six occasions: January 9, 2013, April 2, 2013, June 27, 2013, March 21, 2014, October 15, 2014, and August 11, 2015. However, in all of those records Dr. Savage noted that the claimant experienced pain with overhead abduction, horizontal adduction, internal rotation, and with flexion over the head. Further, on October 15, 2014, Dr. Savage noted that the claimant had only a limited range of motion in his shoulder. These records support Dr. Savage's opinions that the claimant could not reach overhead. Contrary to the ALJ's finding, the substantial evidence in the record supports Dr. Savage's conclusions about the claimant's physical impairments. (R. 24, 470–71, 475–76, 478–79, 529–32, 534–35).

Additionally, the ALJ gave Dr. Savage's opinion that the claimant was disabled little weight, stating that determination is reserved to the Commissioner of Social Security under 20 C.F.R. 404.1527(e). But the ALJ reviewed Dr. Estock and Dr. Neville's opinions regarding the claimant's depression, activities of daily living, and psychological symptoms and gave both doctors' opinions "good weight." However, the ALJ's determination that Dr. Estock and Dr. Neville's opinions were more credible than Dr. Savage's opinions is unfounded and unsupported by substantial evidence. (R. 24–25).

Dr. Neville focused on the claimant's psychological limitations, not on the limiting effects of his physical impairments. And while Dr. Estock's report did consider the claimant's physical limitations, he never examined the claimant and based his findings on evidence from Dr. Savage. The opinion of a non-examining physician does not constitute the good cause needed to reject a treating physician's opinion, and the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician. *Lamb*, 847 F.2d at 703; *Broughton v. Heckler*, 776 F.2d 960, 961–62 (11th Cir. 1985). (R. 92–105, 455–58).

Dr. Neville only saw the claimant once, on January 14, 2013, and Dr. Estock made his report on January 30, 2013 based only on a review of records. Comparatively, Dr. Savage saw the claimant at least thirty-two times between 2011

and 2015, including at least fifteen appointments after January 2013. Given that Dr. Savage has been the claimant's treating doctor for many years, his assessment was the only one that seemed to take into account the totality of the claimant's physical impairments. (R. 92–102, 394–405, 408–15, 417–24, 428–32, 455–58, 468–71, 473–86, 490–91, 526–40).

No substantial evidence supports the ALJ giving Dr. Savage's opinions little weight.

*Other Concern*

Because of this determination, the court does not need to address other issues the claimant raised on appeal. But, the court also questions the ALJ's finding that the claimant's daily activities negate his subjective statements about the limiting effects caused by his neck, lower back, and shoulder. The facts that the claimant can care for his personal hygiene, drive a car for short distances, go shopping occasionally for brief periods, and load the dishwasher do not show that he can sustain full-time employment. Even a disabled person can visit his grandmother and go to church from time to time. The claimant does not have to be an invalid who does absolutely nothing and never leaves his home to be disabled and unable to work full-time. *See Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986) (substantial evidence did not support the ALJ's finding that the claimant's ability to do simple household chores negated her claims that she had to

lie down every two hours because of her impairments); *Smith v. Califano*, 637 F.2d 968, 971-72 (3d Cir. 1981) ("[S]tatutory disability does not mean that a claimant must be a quadriplegic or an amputee. . . . Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity. . . . It is well settled that sporadic or transitory activity does not disprove disability.") (citations and quotations omitted). On remand, the ALJ should reevaluate this issue.

## VIII. CONCLUSION

For the reasons stated above, this court concludes that substantial evidence does not support the ALJ's decision and that it is due to be REVERSED and REMANDED. The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 2nd day of August, 2018.

_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE